56 CCPA

### Application of Frederick C. TARBOX.
### Patent Appeal No. 8092.

United States Court of Customs and Patent Appeals.

June 19, 1969.

N. Douglas Parker, Jr., Washington, D. C., attorney of record; Jerome R. Cox, Columbus, Ohio, of counsel.

Joseph Schimmel, Washington, D. C., for the Commissioner of Patents; Fred W. Sherling, Washington, D. C., of counsel.

Before WORLEY, Chief Judge, and RICH, ALMOND and BALDWIN, Judges.

WORLEY, Chief Judge.

This appeal is from a decision of the Board of Appeals affirming the examiner's rejection of all the claims of appellant's patent application[1] under 35 U.S.C. § 103.

Appellant's invention relates to a grass cutting mower of the type having a tractor and a plurality of cutters. The tractor motor and the individual cutter motors are operated by one hydraulic system best described with reference to Figure 4 of the application:

FIG. 4

---

1. Application of Frederick C. Tarbox, filed December 9, 1963, Serial No. 328,843, for "Improvements in Mowers."

In one position of the main valve (47), fluid from the pump (17) is directed in series through the mower motors (39, 39a, 39b), a variable throttling valve (58) and the tractor motor (63), thus enabling the mower to be driven across a grassy surface to be mowed with the cutter motors operating under full pressure at optimum speed and with the tractor motor moving at a variable speed controlled by the setting of the variable throttling valve.

In another position, the main valve blocks off fluid flow to or from the cutter motors to hold the cutters stationary, with the flow from the pump being directed through the throttling valve to the tractor motor. In that condition the mower may be driven at variable speed or left stationary, depending on the setting of throttling valve, with the cutters immovable.

Independent claims 16 and 17 of appellant's application read:

16. In the power mower combination of a plurality of cutter vehicles, each having cutting blades, and a hydraulic motor powered tractor vehicle for pulling said cutting vehicles the improvement which comprises:

(1) a hydraulic motor on each of said cutter vehicles for driving said cutting blades;

(2) means whereby said tractor motor and each of said cutter motors are actuated by the fluid pressure of a common hydraulic system; and

(3) valve means for controlling said fluid pressure and adapted to, selectively, (a) isolate all said motors from said fluid pressure, (b) isolate only said tractor motor from said fluid pressure while maintaining full fluid pressure to said cutter motors, (c) isolate only said cutter motors from said fluid pressure while providing said tractor motor with a controllable variable and directional fluid pressure, or (d) provide the cutter hydraulic motors with full fluid pressure while providing said tractor motor with a controllable variable and directional fluid pressure.

17. In the power mower combination of a plurality of cutter vehicles, each having cutting blades, and a hydraulic motor powered tractor vehicle for pulling said cutter vehicles the improvement which comprises:

(1) a hydraulic motor on each of said cutter vehicles for driving said cutting blades;

(2) means whereby said cutter motors and said tractor motor are actuated by the fluid pressure of a common hydraulic system;

(3) a valve in said common hydraulic system which provides a selective on-off fluid pressure to said cutter motors while providing a substantially constant positive pressure to said tractor motor; and

(4) a second valve in said hydraulic system which provides a controllable variable and directional fluid pressure to said tractor motor.

Claim 18 depends from claim 17 and adds the additional limitation that at least three overlapping cutter vehicles having at least three overlapping blades are provided.

The references are:

| | | |
|---|---|---|
| Haberland et al. | 2,953,164 | Sept. 20, 1960 |
| Dunn | 3,135,079 | June 2, 1964 |

Haberland discloses a grass cutting mower driven by hydraulic motors and having a hydraulic cutter motor. Operation of the Haberland device is most easily understood from Figures 1 and 7 of the patent:

In Haberland, fluid from a pump P is directed to a cutter motor M3 to drive the cutter blades B, with the flow of fluid from the motor returning via a line (30) to a reservoir R. Fluid is also directed through a line (13) to a spool valve C which contains an inner member having an internal recess (56). In a neutral position of the spool valve C shown in Figure 1, the recess (56) directs the incoming fluid from the line (13) to two outlet ports (25, 26) which return the fluid through a line (28) to the reservoir R. To move the vehicle, the inner member of the spool valve C is rotated forwardly to the position shown in Figure 7 in which the recess (56) directs the incoming fluid to two ports (16, 17) which communicate through lines (21, 23) with the wheel motors $M_1$, $M_2$ to drive them. The speed of the wheel motors $M_1$, $M_2$ may be varied by selectively controlling the spool valve C. To control the cutter blade movement, the motor $M_3$ may be selectively bypassed through a line (14) controlled by a valve V interposed in the line (14).

The Dunn patent discloses grass mowing apparatus comprising three hydraulically powered cutting units connected in series, drawn by a tractor. However,

the tractor is not disclosed as being powered by a hydraulic motor.

The examiner rejected the claims under 35 U.S.C. § 103, taking the position that the only difference between the vehicle-mower combination of Haberland and appellant's claimed device was that appellant provides a separate motor for each of the cutters which would be an obvious expedient in view of Dunn's showing of 3 hydraulic cutting motors connected in series. Appellant argued that the valves V and C of Haberland would not conform in their operation to the requirements of the claims on appeal and, in particular, that valve V failed to "isolate" the cutter motor. The board affirmed the examiner, stating:

> It appears to us that the patent to Haberland et al. does show a construction wherein the operation of the valve means V and C thereof conforms to the requirements of the claims.

Appellant takes issue with the Examiner's interpretation of Haberland et al., arguing that the Examiner is in error in stating that the valve V of the system of the patent is merely a by-pass valve and will not isolate the cutter mowers at any time. As we see it, the specification of Haberland et al. at column 3, lines 19–37 inclusive clearly discloses that the motor M-3 will not actuate the cutter blades when the valve V is open. This condition, therefore, is one wherein the motor M-3 is isolated from the rest of the system insofar as concerns the operation thereof. The motor M-3 will, at that time, be isolated from the fluid pressure.

Appellant here draws attention to what he considers a region of uncertainty in the disclosure of the Haberland patent and hypothesizes various arrangements of the Haberland components within that uncertain region, each of which arrangements appellant asserts would fail to provide the operation required by the claims. The uncertainty pointed to by appellant concerns the location of the upstream end of line (13), as to which Haberland states:

> Pump P supplies a flow of fluid under pressure, from reservoir R and line 11 through line 12 to hydraulic motor M-3 and line 13 to directional control valve C. * * *

Appellant takes the position that the above language would be consistent with either:

> (1) connection of the upstream end of line (13) to the outlet from the cutter motor M3, which would be consistent with the drawings but might be inconsistent with the specification,[2] or
> (2) connection of the upstream end of line (13) to line (12) upstream of motor M3, which would be consistent with an interpretation of the drawings as representing line (13) passing underneath M3 to connect with line (12) upstream of M3.

Considering the first possibility, if line (13) and line (30) are both receiving flow from the outlet of M3, then the lines (13) and (30) would presumably be in fluid communication with each other. If that were so, whenever valve V were opened fully to bypass M3 to stop the blades, then the flow through conduit (14) would pass directly via communicating lines (13) and (30) to the reservoir so that none of the motors $M_1$, $M_2$ and $M_3$ would operate, clearly an unacceptable result.

---

2. It might be considered that Haberland returns all the outflow from M3 via line (30) as the only disclosure as to that line states:

 It is to be noted also that the hydraulic motor M-3 is connected by line 30 to the return line 28 to permit the flow of fluid from the hydraulic motor M-3 to return to the reservoir R.

The other possibility, that the upstream end of Haberland's line (13) connects to line (12) upstream of the motor M3, is illustrated by the following hypothetical diagram from appellant's brief:

FIG A

Regarding that figure, appellant speculates:

In the construction of Fig. A, the line 13 is shown in parallel with line 14 as if it is positioned behind the motor M-3 in Haberland's Fig. 1. In such case it would serve as a permanent by-pass of valve V. Thus, if the structure shown in Fig. A is Haberland's construction, valve V would have no effect and is useless, and the provision of valve V in this manner is not consistent with the other description of Haberland. This appears obvious because line 13 in Fig. A is the equivalent of line 14 with valve V open.

If that contention of appellant's were correct, it would, of course, cast considerable doubt on the accuracy of the following statement from Haberland to which the board looked in deciding that motor M3 was isolated by opening of valve V:

If the valve V is open and permits flow through the by-pass line 14 there is insufficient power in the hydraulic motor M-3 to drive the blades B and, conversely, if the valve V does not permit full flow through the by-pass line 14 full or partial fluid pressure is directed into motor M-3 to drive the blades B.

However, appellant's speculation is not conclusive for it could equally be speculated with reference to appellant's Figure A that if the portion of line (13) bypassing M3 were to be of sufficiently narrow bore to present a resistance to passage of fluid comparable to that presented by M3 and if bypass conduit (14) were to have a very wide bore and low impedance, then it might not indeed be until valve V is opened that M3 is effectively bypassed.

From the foregoing, it appears that speculation alone as to the operation of Haberland, which forms the basis of appellant's argument, is inconclusive. We therefore think we must accept as correct the portion of Haberland just quoted above explicitly describing the action of valve V, when fully open, in terminating the driving action of the motor M3 driving the blades. That action is, we think, consistent with the previously quoted conclusion of the board that:

> This condition, therefore, is one wherein the motor M-3 is isolated from the rest of the system insofar as concerns the operation thereof.

Also, there appears to be no sound reason to doubt that such operation could be attained by one of ordinary skill in the art following Haberland's disclosure.

Another argument that appellant makes is that with valve V of Haberland closed to permit operation of the cutter motor M3 and with valve C in forward drive position to direct fluid to the wheel motors $M_1$ and $M_2$, then less than full pressure will be applied to the cutter motor M3 with the result that Haberland could not satisfy the requirement of claim 16 that the system:

> (d) provide the cutter hydraulic motors with full fluid pressure while providing said tractor motor with a controllable variable and directional fluid pressure.

That argument appears to be based on an incorrect understanding of Haberland for it appears from Figure 7 thereof, as interpreted by appellant's Figure A, that, with V closed and C in forward position, two fluid paths exist between the high pressure source P and the low pressure reservoir R. One path is through the line (13), valve C and motors M1 and M2 and the other path is through motor M3 and the line (30). However, both those paths are in parallel so that full pressure is applied across both. We are therefore unable to accept appellant's argument that less than full pressure [3] is applied to motor M3.

We are satisifed the board was correct in concluding that the Haberland patent discloses a mower cutter combination in which the operation of the valves V and C conform to the requirements of the claims. As it is quite clear that merely increasing the number of cutting units would be obvious from the teachings of Dunn, we therefore affirm the decision of the board.

Affirmed.

---

3. Further on that point, the solicitor urges that the cutter motor will have full pressure "because the pump in Haberland et al. has a direct connection to the motor M-3." He states:

> * * * In fact, the cutter motor would be more likely to have full pressure in Haberland et al. than in appellant's apparatus wherein the fluid must pass through valve 47 before reaching the cutter motors. Therefore, Haberland et al. do provide the cutters with full

pressure while providing the tractor motors with a controllable perssure in accordance with the positions of the valves V and C in much the same manner as appellant provides such control with valves 47 and 58. * * *

Consistent with that argument, we are satisfied from the direct connection of the motor M3 of Haberland to the fluid pressure supply that appellant's position that less than full pressure is applied to that motor is not sound.